**Stephen H. GARDINER et al., Plaintiffs,**

**v.**

**Curtis W. TARR, Director of the Selective Service System, Defendant.**

**Civ. A. No. 385–72.**

United States District Court,
District of Columbia,
Civil Division.

April 18, 1972.

Donald S. Burris, David A. Jones, Washington, D. C., for plaintiffs.

Robert M. Werdig, Asst. U S. Atty., Washington, D. C., for defendant.

Scott J. Tepper, San Francisco, Cal., on behalf of the American Civil Liberties Union, New York Civil Liberties Union Selective Service and Military Law Panel, National Capital Area Civil Liberties Union, Los Angeles Selective Service Lawyers' Panel, interested classes of California conscientious objectors, as amicus curiae.

## OPINION

FLANNERY, District Judge.

### I

Plaintiffs in this action are classified as conscientious objectors (Class I–O) under the classification scheme of the Selective Service System. They complain of illegal policies and actions improperly promulgated by the Defendant herein, ordering them to perform two years of compulsory service at a time when all registrants classified I–A (available for military service) and I–A–O (available for military non-combatant duties) who occupy similar positions in the order of call for individual male citizens registered for the draft are not only not being ordered to report for induction but are, in fact, being placed in a particular selection group under the draft lottery making it virtually certain that they will never be ordered to report for induction. Plaintiffs contend that this disparate treatment is violative of the Military Selective Service Act of 1967 and the 1971 Military Selective Service Act (50 U.S.C. App. § 456(j)) [hereinafter referred to as either the "1967 Act" or the "1971 Act"] and the validly-promulgated regulations issued thereunder governing the processing and induction of conscientious objectors for civilian work service, and, in addition, is arbitrary and discriminatory in violation of the Due Process Clause of the Constitution and the Equal Protection Clause as it is incorporated thereunder. In the alternative, Plaintiffs assert that the rules and regulations which purport to validate this disparate treatment have been promulgated by Defendant in a manner which violates the letter and spirit of the pre-publication requirements of the 1971 Act, and the Section of the Administrative Procedure Act referred to as the Freedom of Information Act, 5 U.S.C. § 552 and Section 2 of the Executive Order 11623, 36 F.R. 19963 (Oct. 14, 1971).

Plaintiffs filed their complaint on March 3, 1972, as a class action on behalf of two classes of similarly-situated persons classified as conscientious objectors. On March 7, after notice and hearing, this Court with the consent of the Defendant, issued a temporary restraining order enjoining Defendant from issuing or enforcing orders to report to civilian service as to any of the Plaintiffs named in the complaint until 5:00 p. m. on March 27, 1972. The parties agreed to a procedure whereby Defendant would file a motion for summary judgment and to dismiss the cause as well as an opposition to the Plaintiffs' contemplated motion for preliminary injunction by March 17, 1972, and the Plaintiffs would, in the interests of full and expeditious resolution of this important case, in one docu-

ment, respond to the motion for summary judgment and file a memorandum in support of their motion for preliminary injunction prior to the March 27, 1972 date set for hearing. The Defendant did not, however, file his motion for summary judgment and dismissal and opposition to Plaintiffs' motion for preliminary injunction until March 21, and the Court, therefore, with the concurrence of the parties, extended the date for hearing until April 4, 1972, and over the objection of the Defendant, extended the Temporary Restraining Order until 5:00 p. m. on that date. In the period between the March 7 and March 27 hearing dates, the plaintiffs, being advised that several individual lawsuits had been filed in other jurisdictions on behalf of certain members of the classes described in the complaint, dismissed the action as to the two classes and converted it into a proceeding on behalf of the individual Plaintiffs.

Thereafter, the Plaintiffs also filed a cross motion for summary judgment, and, just prior to the hearing on April 4, 1972, counsel for *amici curiae*, the American Civil Liberties Union the New York Civil Liberties Union Selective Service and Military Law Panel, the National Capitol Area Civil Liberties Union, the Los Angeles Selective Service Lawyers' Panel and several interested classes of California conscientious objectors, was permitted to file a brief and to participate in oral argument.

To resolve this substantial challenge to the Director's actions the Court must plunge into the thorny thicket of what are often conflicting Selective Service laws which have progressively developed into "an intricate maze through which the uninitiated lawyer, let alone a young man subject to the law's provisions, cannot easily find his way." Nestor v. Hershey, 138 U.S.App.D.C. 73, 425 F.2d 504, 508 (1969).

## II

Before reaching the merits of Plaintiffs' action, the Court necessarily must determine whether it has jurisdiction over this claim or whether pre-induction judicial review of Plaintiffs' claims are barred by § 10(b) (3) of the Military Selective Service Act of 1967, 50 U.S.C. App. § 460(b) (3). Section 10(b) (3) was enacted by Congress to prevent litigious delay in the process of raising and army and states flatly that a classification decision of the local board "shall be final, except where an appeal is authorized . . . " and that the classification decision on appeal also "shall be final . . . " It further states, "No judicial review shall be made of the classification or processing of any registrant . . . except as to a defense to a criminal prosecution . . . after the registrant has responded either affirmatively or negatively to an order to report for induction . . . "

Challenges to § 10(b) (3) have reached both the United States Court of Appeals for the District of Columbia and the Supreme Court. *See* Fein v. Selective Service System, 405 U.S. 365, 92 S.Ct. 1062, 31 L.Ed.2d 298 (1972); Oestereich v. Selective Service Board, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968); Swift v. Director of Selective Service, 448 F.2d 1147 (D.C.Cir.1971); Shea v. Mitchell, 137 U.S.App.D.C. 227, 421 F.2d 1162 (1970); Nestor v. Hershey, 138 U.S.App. D.C. 73, 425 F.2d 504 (1969). Although some of these cases found § 10(b) (3) did bar pre-induction judicial review in particular fact situations, the Court reads these decisions together as being consistent and finds their net effect to be the carving out of a narrow exception to § 10(b) (3). That exception is that where the statutes or regulations giving rise to a plaintiff's claim allow the Selective Service System discretion, § 10(b) (3) bars pre-induction judicial review. On the other hand, where those statutes or regulations mandate a deferment, an exemption or certain processing treatment such that the Selective Service System is given no choice or discretion, pre-induction review will lie when it is asserted that such statutes or regulations

have been violated by the Selective Service System. The United States Court of Appeals for this Circuit recently stated, "[s]ince resolution of this question involves only a legal issue, and does not call for a review of a factual determination or the exercise of discretion by the local board, we think it plainly can be reached on pre-induction review." Swift v. Director, *supra*, 448 F.2d at 1150.

Recognition of this exception causes the issue of jurisdiction to be "inextricably intertwined with the merits of the controversy," that is with the proper construction of the statutes or regulations in question. Nestor v. Hershey, *supra*, 425 F.2d at 511. In *Nestor*, the plaintiffs' claim stemmed from the regulations granting I–S student deferments. The Court found that these regulations mandated that a registrant in plaintiffs' position be granted a I–S deferment and, therefore, found jurisdiction. Similarly, in *Shea, supra*, the Court found that the regulations pertaining to "fatherhood deferments" mandated that someone in plaintiff's position be granted a III–A deferment and therefore § 10(b) (3) was found not to be a bar to pre-induction judicial review.

■ The Court finds that § 6(j) of the Military Selective Service Act of 1967, 50 U.S.C. App. § 456(j) *mandates* that a conscientious objector (I–O) may not be ordered to perform alternative service until his I–A and I–A–O counterpart has been inducted. Therefore, the Court concludes that § 10(b) (3) does not bar its determination of whether vis-a-vis the named Plaintiffs, the Selective Service System has complied with this mandate, and since Plaintiffs have arguably sustained their burden of the requisite jurisdictional amount, *see* Berk v. Laird, 429 F.2d 302, 306 (2nd Cir. 1970); Friedman v. International Ass'n of Machinists, 95 U.S.App.D.C. 128, 220 F.2d 808 (1955); Walsh v. Local Board No.

10, 305 F.Supp. 1274, 1275–1276 (S.D. N.Y.1969), the Court finds that it has jurisdiction.

### III

Under each Selective Service Act enacted by Congress and the regulations promulgated thereunder, an individual upon registering for the draft at age 18 was placed within a certain classification and subject to reclassifications by the local draft board with which he was registered according to his changing status until such point as he became eligible for induction or alternative service in lieu of induction or was rendered by age or disability permanently ineligible for service. The particular classifications have varied slightly under the different Acts, but the ones under discussion here, namely, Classes I–A, I–A–O, and I–O, may be considered not to have been changed in any significant respect. The present case concerns a number of registrants in the latter category (Class I–O), registrants who:

"ha[ve] been found, by reason of religious, ethical, or moral belief, to be conscientiously opposed to participation in war in any form and to be conscientiously opposed to participation in both combatant and noncombatant training and service in the Armed Forces." 32 C.F.R. § 1622.14 (1971).

■ The right of persons who have been found to have such a conscientious objection to be exempted from any service in the Armed Forces of the United States has been recognized in every conscription Act since 1940. However, at the same time, Congress has provided that conscientious objectors shall be required "in lieu of induction" and "subject to such regulations as the President may prescribe"[1] to perform approved

---

1. The exact criteria set forth in these regulations have varied somewhat since 1940, but essentially Defendant and his predecessor in office have required that the work "contribute to the maintenance of the national health, safety or interest." See 32 C.F.R. § 1622.16 (1971) 32 C.F.R. 1660.6 (proposed), 5 SSLR 2000:32 (1972), 36 F.R. 21294 (Nov. 5, 1971); effective Dec. 10, 1971, 36 F.R. 23383

civilian alternative service for a two-year period. Act of 1967, § 6(j), 50 U.S.C. App. § 456(j) (1970). This requirement on its face is subject to one prerequisite: the individual concerned may be ordered to report for alternative service only if the order is issued "in lieu of induction", *i. e.*, only if he would have received an order to report for induction had he been classified I–A (available for military service) or I–A–O (available for military service only in a noncombatant capacity).

The Court will hereinafter designate as Group 1 those Plaintiffs who were transferred from the 1970 "First Priority Selection Group" into the 1971 "Extended Priority Selection Group".[2] It appears that those Plaintiffs have been issued SSS Form 152 [Special Report for Class I–O Registrants] prior to April 1, 1971.

The Court will designate as Group 2 those Plaintiffs who were members of the 1971 First Priority Selection Group whose Random Selection Numbers (R.S. N.'s) are 125 or lower and who were issued SSS Form 152 prior to November 9, 1971.

A series of regulations issued under the pre-1971 alternative service provisions of the Act, in effect on December 9, 1971, the last date on which any registrant could be called for induction in 1971, and thus governing the disposition of those Plaintiffs in Group 1, recognized that I–O registrants must be called in identical sequence to those registrants classified I–A and I–A–O. Specifically, they provided that:

"such order [to report for alternative service], shall not be issued prior to the time that the registrant would have been ordered to report for induction if he had not been classified in Class I–O. . . ."

32 C.F.R. § 1660.20(a)–(d) (1971). *See* United States v. Dudley, 451 F.2d 1300 (6th Cir. 1971), equating "prior to . . " with the statutory phrase "in lieu of induction."

Moreover, the alternative service regulations issued under the 1971 Act and thus relating to the disposition of those Plaintiffs in Group 2 contain similar language:

"A non-volunteer will not be ordered to perform alternate service in lieu of induction before registrants with his [Random Selection Number] who are Classified in Class I–A or I–A–O are ordered for induction." 32 C.F.R. § 1660.4(a) (1972).

In order to understand the way in which the Plaintiffs claim Defendant is attempting to violate these principles and regulations by calling certain I–O registrants who would not have been called had they been in Classes I–A and I–A–O, it would seem useful to review the procedures which governed the manner in which registrants were to be called and inducted into the Armed Forces prior to January 1, 1972, the date by which the Plaintiffs contend they all had become members of a certain group in the order of call and thus should now not be ordered for work.

## IV

On November 10, 1971, Defendant issued a "Local Board Memorandum" dividing the Extended Priority Selection Group [EPSG] into two subgroups. Local Board Memorandum 99 [hereinafter referred to as LBM 99]. The published version of LBM 99 provided that registrants who first entered the EPSG in 1971 were to be assigned to Subgroup A of the EPSG, and registrants who first entered the Extended Priority Selec-

---

(Dec. 9, 1971), 5 SSLR 2000:18.2 (1972). Defendant has also required at various times that the work be for wages roughly comparable to the earnings of a serviceman and be performed outside the registrant's "community of residence."

2. Under certain circumstances, a registrant whose RSN is reached during a given calendar year may have his liability extended into the following calendar year and thus become a member of that year's Extended Priority Selection Group.

tion Group in 1972 were to be assigned to Subgroup B. A new subgroup was to be established in this manner each succeeding year and all members of Subgroup A were to be called ahead of members of Subgroup B. LBM 99, para. III B, 36 F.R. 21548 (Nov. 10, 1971).

LBM 99 treated I–A, I–A–O and I–O registrants in a parallel manner. Thus, I–A, I–A–O and I–O registrants were considered to be in one of the two subgroups of the Extended Priority Selection Group if and when their number had been "reached" by their local board during a calendar year and they had not been issued an order to report for induction or for civilian service. Furthermore, no registrant in any of these classifications could be ordered out of the EPSG for induction or civilian work unless there were calls for registrants during the first quarter of the calendar year, and their number was reached as to all these calls. See 32 C.F.R. § 1631.7 (1971); LBM 99, *supra*. Absent such calls, the registrants were required to be placed in a lower priority selection group, one from which there have never been any men drafted to date.

As of January 1, 1971, the date on which all Group 1 Plaintiffs entered the 1971 Extended Priority Group, the processing and ordering to work of conscientious objectors in Class I–O was governed by Part 1660 of the Selective Service Regulations and the relevant Local Board Memorandum. In each subsection, Part 1660 provided that an order to report to civilian work "shall not be issued prior to the time that the registrant would have been ordered to report for induction." 32 C.F.R. § 1660.20(a–d) (1971). Similarly, on January 1, 1972, the date on which Group 2 Plaintiffs became members of the 1972 EPSG, the regulation in effect provided that a I–O would not be ordered to perform alternate service "before registrants with his [Random Selection Number] who are classified in Class I–A or Class I–A–O are ordered for induction." 32 C.F.R. § 1660.4(a) (1972).

Under the regulatory scheme, a I–O registrant who was not a volunteer for civilian service was processed in the following manner. First, he was ordered to submit to an Armed Forces physical examination. If he passed this examination or failed to report for or submit to it, he was sent, within 10 days of the appropriate event, a "Special Report for Class I–O Registrants" (SSS Form No. 152), on which he was to submit three types of civilian work which he was qualified to perform. 32 C.F.R. § 1660.20(a) (1971). See also Local Board Memorandum 64, as amended, September 12, 1968, 4 SSLR 2183.[3] Thereafter, as was explained in Paragraph 4(a) of Local Board Memorandum 64, the registrant was to "be processed in accordance with the pertinent provisions of § 1660.20." SSS Form 152 was labeled "Special Report for Class I–O Registrants," and was an informational inquiry allowing the I–O registrant to suggest three types of work for which he felt himself qualified and to inform the local board of his work experience and skills. There were no criminal penalties or other sanctions attached to a failure to return the Form; if the registrant failed to return it or suggested no jobs which he was willing to perform, he was processed at an accelerated rate. Moreover, the regulations did not require as a prerequisite to issuance of a Form 152 that the RSN of the I–O registrant had been "reached" and that he was thus available for ordering to alternative service. See Local Board Memorandum 64, *supra*. Plaintiffs contend that it was only when the local board mailed to a I–O registrant the SSS Form 153 entitled "Order to Re-

3. A man could be, and usually was ordered to report for a pre-induction physical while still in a deferred classification, or before he was reached in the order of call. 32 C.F.R. § 1628. The Form 152 was required to be sent to all I–O registrants within 10 days of the mailing to his Statement of Acceptability, LBM 64, para. 4(a), and thus was in no way related to the actual "reaching" of the individual in the order of call.

port for Civilian Work and Statement of Employer" after his number was reached in the order of call that a conscientious objector under the pre-1972 procedures might be said to have been called and ordered to report "in lieu of induction." No Plaintiff in this proceeding had such an order outstanding as of December 31, 1971.

Just as there were distinct procedures for processing and ordering to work conscientious objectors which paralleled the procedures applicable to registrants classified I–A and I–A–O, so too were there parallel (and in fact identical) procedures for placing these I–O registrants in the various selection groups including the Extended Priority Group, and for transferring them to a lower priority group if they had not been ordered to report for service within the requisite 90-day period. Thus, I–O registrants in the First Priority Selection Group in 1970 whose numbers had been "reached" by their local boards and were sent the SSS Form 152 in 1970 but were not sent a SSS Form 153 ordering them to report for alternate service were, under the terms of 32 C.F.R. § 1631.7, part 1660 and Local Board Memorandum 99, placed in the Extended Priority Selection Group in 1971. The pertinent provision in the Local Board Memorandum 99 stated:

> F. *Selection of Registrants in Class I–O.* In all instances, registrants classified I–O shall be selected for civilian work exactly as if they were in Class I–A or Class I–A–O. If such registrants are assigned to the Extended Priority Selection Group they shall remain in that group after April 1 only if registrants who are I–A or I–A–O with the same or higher RSNs also remain in that group. All other I–O registrants from the extended group will be assigned to the Second Priority Selection Group on April 1.

And the Local Board Memorandum governing the disposition of I–O registrants in the 1971 First Priority Selection Group and thus Group 2 Plaintiffs is even more clear on its face:

> "Any registrant in the First Priority Selection Group on December 31 or any calendar year, whose random sequence number was reached during that year, but who was not issued an SSS Form 252 [induction order] *or an SSS Form 153* [Order to Report for Civilian Work] with a scheduled reporting date within that calendar year, shall on January 1 of the following year, be assigned to the Extended Priority Group." [LBM 99, para. III E. (1), 36 F.R. 21549 (Nov. 10, 1971). (Emphasis added).

Any I–O registrant in the EPSG who was not issued an SSS Form 153 with a reporting date prior to April 1 of the year in which he entered the EPSG was to be transferred to the Second Priority Group on that date. LBM 99, para. III F.

Because there were no draft calls in the first three months of 1972, all registrants classified I–A and I–A–O and placed in Subgroup B (i. e., those who had entered Extended Priority on January 1, 1972) should have entered the Second Priority Group on April 1 by the terms of this Local Board Memorandum and 32 C.F.R. § 1631.7(d) (5) (1971).[4] In addition, all I–A and I–A–O members of Subgroup A of the EPSG (originally members of the 1970 First Priority Group) who had not received induction orders by April 1, 1972, because of appeals, deferments, or any other delays such as the induction authority expiration and the low draft calls in the remainder of 1971 have now been assigned to the Second Priority Group. See Temporary Instruction 632.3. And even those I–A and I–A–O registrants actually issued induction orders prior to November

---

4. This section provides: "Members of the Extended Priority Selection Group who have not been issued orders to report for induction and originally scheduled for a date prior to April 1 shall forthwith be assigned to the lower priority selection group to which they would have been assigned had they never been assigned to the Extended Priority Selection Group . . . ."

9, 1971 have now had those induction orders cancelled. These regulatory policies on their face applied equally to registrants in Class I–O and therefore I–Os should not have been ordered to work if they were entitled to enter the Extended Priority Group on January 1, 1972. See LBM 99, para. III F. However, Defendant has taken the official position that on the basis of certain letters and instructional memoranda which he has caused to be issued, certain registrants in Class I–O are to be singled out and treated differently in the order of call. The Court now turns to the background and chronology of this policy.

V

The authority of the President to induct persons into the Armed Forces (and, therefore, into civilian work) expired on July 1, 1971 with the expiration of the Military Selective Service Act of 1967. This authority was not renewed until September 29, 1971. Pub.L. 92–129, 85 Stat. 348 (Sept. 28, 1971). During this period, no one (with the exception of medical specialists, drafted under separate authority) was inducted into the Armed Forces or ordered to report for civilian work. However, Defendant did continue to issue SSS Forms 152 (Special Report for Registrants in Class I–O) to I–O registrants.

Because of this lapse in induction authority, there developed a large backlog of eligible men who had lost their deferments in 1971, but who were not inducted because of the low call (approximately 10,000 men) for men in October and November. Since all induction orders to fill draft calls in 1971 had to be issued before November 9, 1971, those men who did not receive such orders by that date, regardless of the reason, entered the Extended Priority Group on January 1, 1972. This group, which has come to be known as Subgroup B, totalled about 115,000 men.

Yet, on December 14, 1971, Defendant issued a Letter to All State Directors (LASD 00–51) which ordered local boards to send SSS Form 155, a new form designed to notify I–O registrants that they are obligated to perform work, to all I–O registrants whose lottery numbers were beneath the ceiling set by Defendant (but not necessarily the number actually reached by each local board in filling the quotas in the manner previously described) for the calendar year 1971. LASD 00–51, which was not published, also stated that SSS Form 155 had to be mailed to each of these registrants prior to January 1, 1972. The letter was sent out at a time when no induction orders were being sent to men in Class I–A or I–A–O since the last induction orders had been sent before November 9 and there were no quotas to be "reached".

On January 11, 1972, two new letters were issued by the Director. The first was an amended version of LASD 00–51, requiring that each SSS Form 155 issued to those I–O registrants in the 1971 EPSG (referred to in the LBM as Subgroup A) who had not received the Form 152 before April 1, 1971, and issued to men in the 1971 First Priority Selection Group who had not received a Form 152 prior to November 9, 1971, was to be cancelled.

The second letter issued on January 11 was LASD 00–53. By its terms, the Defendant ordered the local boards to place all registrants in Class I–A or I–A–O whose numbers had been beneath the 1971 ceiling of RSN 125 but had not received orders to report for induction, in the EPSG Subgroup B.

On February 2, 1972, Temporary Instruction 632–1 (part of a new "Registrant's Processing Manual") was issued. This Instruction ordered the cancellation of all postponed induction orders issued in 1971 except those orders with specific reporting dates subsequent to April 1, 1972. By its terms, the orders of more than 11,000 of the approximately 12,000 men under postponed induction orders were cancelled and these I–A and I–A–O registrants were placed in the Second Priority Selection Group (Press Release 72–3, Feb. 8, 1972). One week later, a personal letter to all state directors, signed by the Defendant, directed

the release of all men in Subgroup A of EPSG who agreed to drop appeals before March 20, 1972.

On February 14, 1972, Defendant issued Temporary Instruction No. 660–1. This Instruction rescinded LASD 00–51, but reiterated its contents with one alteration—any member of Subgroup A of EPSG who had not been classified I–O until 1971, need not have received the Form 152 until November 9 rather than April 1 of that year. On March 8, 1972, Defendant issued Temporary Instruction No. 632–3, which placed all Class I–A and I–A–O registrants in Subgroup A in Second Priority, whether or not they had dropped any outstanding appeals. This Temporary Instruction provided that "all registrants in Subgroup A of the Extended Priority Selection Group, except those already under orders for induction or alternate service are now eligible for assignment to the Second Priority Selection Group." Finally, on March 14, 1972, Defendant issued Temporary Instruction No. 632–4. This Instruction cleared up an unintended ambiguity and provided that the provisions of the so-called "Registrant Processing Manual" which was published in the Federal Register on March 14, 1972 and which set forth a certain procedure for processing registrants did not apply to the present

members of Subgroup B. Instead, they were to be assigned to the Second Priority Selection Group on April 1, 1972, "as was provided in LBM No. 99 and Temporary Instruction No. 632–1."

This summary of the procedures utilized in processing registrants classified I–A, I–A–O and I–O leads to two conclusions. The first is that the terms of the regulations and Local Board Memorandum mandate that conscientious objectors may not be ordered to report for civilian work unless and until registrants classified I–A and I–A–O with a similar place in the order of call, as determined by the registrant's Random Sequence and membership in a particular Priority Selection Group and, where relevant, a particular Subgroup, are called for induction.

The second conclusion is that each Plaintiff in this proceeding was to be considered in the Extended Priority Selection Group on January 1, 1972.[5] The Group 2 Plaintiffs should be so considered because of the clear terms of LBM 99, published in the Federal Register. The Group 1 Plaintiffs should be so considered because all of their I–A and I–A–O counterparts whose numbers were also reached but who were not ordered to report for induction have in fact been placed in Second Priority.

5. The Court recognizes that it is the Defendant's position that none of the Plaintiffs are in the 1972 Extended Priority Selection Group. The Defendant reaches this conclusion because all Plaintiffs had received timely SSS Form 152s and, in the Defendant's judgment, were locked into the System. The Court rejects this position. This posture of the Defendant conflicts with earlier treatment afforded by the System to these Plaintiffs. For example, 32 C.F.R. § 1631.7, part 1600 and Local Board Memorandum 99 placed Group 1 Plaintiffs, registrants in the First Priority Selection Group in 1970 whose numbers were reached during that year and who were sent SSS Form 152 in 1970 but not ordered to report for particular alternative service, in the 1971 Extended Priority Selection Group. Similarly, the System placed Group 2 Plaintiffs, registrants whose numbers

were reached in 1971, in the 1972 EPSG. See LBM 99, para. III E. (1) (Nov. 10, 1971). The point is that contrary to the position now taken by the Defendant, he has, on occasion and in the recent past, treated these Plaintiffs as though they were in the EPSG. Moreover, the Defendant has insisted on treating I–As who were locked into the System beyond recall once they received the SSS Form 252, as eligible for 1972 EPSG treatment, as long as they had, not actually been inducted during 1971 and were scheduled for induction during the first quarter of 1972. If the Defendant insists on the right to treat locked-in I–As as members of the 1972 EPSG, the parallel treatment formula which has always been at the heart of the conscientious objector provision of the Act argues persuasively that locked-in I–Os also be treated as members of the 1972 EPSG.

## VI

In view of the foregoing, the Court must determine three questions:

A. Was the SSS Form 152 equivalent to SSS Form 252 such that receipt of SSS Form 152 locked a I–O registrant into the System with the same force that a SSS Form 252 locked in a I–A or I–A–O registrant by ordering him up for induction;

B. If the SSS Form 152 did not lock in a I–O registrant, did subsequent Selective Service letters and memoranda directing that SSS Form 152 have a lock-in effect cure this defect and give SSS Form 152 its desired locked-in effect, or must these directives be declared invalid because they were unpublished in contravention of the Military Selective Service Act of 1967; and finally

C. Even if the court finds that the I–O plaintiffs were locked into the System, must their work orders be set aside because in contravention of § 6(j) of the Military Selective Service Act and accompanying regulations, the Selective Service System did not induct the Plaintiffs' I–A and I–A–O counterparts who had been locked in at the same time.

## A

 The Court finds that receipt of a SSS Form 152 does not lock-in a I–O registrant and, therefore, is not equivalent to the SSS Form 252 which calls a I–A or I–A–O registrant to induction.

First, the nature of the form itself supports the proposition that it is not a lock-in device. It provides that the I–O receiving it was not being ordered to report for civilian work but spoke of such an order in prospective terms:

*In no case will you be required to perform work until you have been mailed an Order to Report for Civilian Work and Statement of Employer (SSS Form 153).* This order will allow you a minimum of ten (10) days after the date on which it is mailed to you to report to work. However, *your local board will not order you to work prior to the time you would have been ordered to report for induction if you had not been classified in Class I–O . . .* [Emphasis supplied].

Thus, the issuance of a Form 152 did *not* mean that a I–O registrant was irreversibly "locked-in" as was a I–A or I–A–O registrant upon receipt of a SSS Form 252 induction order. After his receipt of SSS Form 152, the I–O's classification could be reopened upon any new information while the registrant who had received SSS Form 252 (induction order) had to satisfy the board that there had been "a change in the registrant's status resulting from circumstances over which the registrant had no control." 32 C.F.R. § 1625.2 (1971). If the I–O registrant reached the age of twenty-six before being ordered to work via SSS Form 153, he was free from the obligation to perform civilian work, while the I–A or I–A–O who had received a SSS Form 252 induction order was still obligated to report past his twenty-sixth birthday. In addition, there were absolutely no criminal penalties attached to a failure to respond to a SSS Form 152; conversely, it was, of course, a felony to refuse to comply to SSS Form 252 (Order to Report for Induction). On the other hand, SSS Form 153 (Order to Report for Civilian Work) is closely analogous to SSS Form 252 because each orders the registrant to enter the service of his country either through military duty or through the performance of alternative civilian work. It is this SSS Form 153 which subjects a registrant to criminal penalties for failure to comply therewith in a manner identical to refusal to obey an Induction Order. Furthermore, it is the SSS Form 153 which gives a registrant at least ten days to report to work in a manner identical to that of a SSS Form 252 Induction Order. It is only upon receiving SSS Form 153 that I–O registrants in Plaintiffs' position might be said to have been "called" for civilian work prior to December 10, 1971.

Second, as stated above, the President had no authority to induct persons into the Armed Forces or order alternate service from July 1, 1971 to September 28,

1971. Yet, although no one was inducted or ordered to report for civilian work, Defendant continued to issue SSS Form 152s. It would seem logical that Defendant himself did not consider SSS Form 152 as a locking device because to deem otherwise would be to conclude that the Defendant consciously was violating the law.

Third, as previously set out, Local Board Memorandum 99, para. III E. (1), 36 F.R. 21549 (Nov. 10, 1971) provided that "[a]ny registrant . . . who was not issued *an SSS Form 252 or an SSS Form 153* . . . shall . . . be assigned to the Extended Priority Group." [Emphasis added]. Again it is clear that the Selective Service System itself regarded the SSS Form 153 as equivalent to the SSS Form 252.

Finally, Letter 00–51 sent by the National Selective Service Office to all State Directors on December 14, 1971, indicated that SSS Form 152 was to be considered as the beginning of processing of I–O registrants provided their Random Selection Numbers had been reached. It seems clear that if this directive was required to change the force and effect of SSS Form 152, before the date of the letter the form was neither intended to be nor was in substance equivalent to the form that locked-in I–As and I–A–Os, SSS Form 252.

### B

■ The Court now turns to the issue of publication. The Defendant contends that even if prior to December, 1971, SSS Form 152 did not lock-in a I–O registrant into the System, the Letter to all State Directors 00–51 issued on December 14, 1971, and subsequently amended in January, 1972, and expanded by Temporary Instruction 660–1, caused the SSS Form 152 to be ordained with authority to lock-in I–O registrants. Plaintiff contends that these directives can be given no effect because they were not published in the Federal Register in clear violation of the Administrative Procedure Act and the related—prepublication requirements of Section 13

(b) of the Military Selective Service Act of 1971, 85 Stat. 353, 50 U.S.C.A. App. § 463(b) (1972). Plaintiffs argue that for this independent reason Plaintiffs are illegally being ordered to civilian service.

The Administrative Procedure Act requires in pertinent part that an administrative agency publish:

"(B) *statements* of the general course and method by which its functions are channeled and determined . . .;

(C) *rules* of procedure . . .;

(D) substantive *rules* of general applicability adopted as authorized by law, and *statements* of general policy or *interpretations* of general applicability . . . [and]

(E) each *amendment, revision,* or *repeal* of the foregoing." 5 U.S.C. § 552 (1970). [Emphasis added].

The Act further provides that "no person [except one with actual and timely notice of the statement, rule, etc.] may *in any manner be adversely affected"* by the statement, rule, etc. if it has not been published in accordance with the Act. 5 U.S.C. § 552(a) (1) (E) (1970). [Emphasis added].

The Administrative Procedure Act defines the term "Rules" to include the following:

"the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or *prescribe law* or *policy* or describing the organization, *procedure,* or practice requirements of an agency." 5 U.S.C. § 551 (4) (1970). [Emphasis added].

Section 13(b) of the Military Selective Service Act provides that the publication requirements of the Administrative Procedure Act are specifically applicable to all functions of the Defendant, including those under attack here. In addition, Section 13(b) places a separate and independent duty upon the Defendant to *pre-publish* regulations. It states in relevant part:

[N]o regulation issued under this Act shall become effective until the expira-

tion of thirty days following the date on which such regulation has been published in the Federal Register. After the publication of any regulation and prior to the date on which such regulation becomes effective, any person shall be given an opportunity to submit his views to the Director on such regulation, but no formal hearing shall be required on any such regulation. [50 U.S.C. App. § 463(b) (1972)].

This statutory requirement may be waived only if the President (1) specifically determines that compliance with these requirements in a particular case would materially impair the National defense, and (2) gives public notice to that effect at the time such regulation is issued. Furthermore, the implementing Executive Order which delegates to Defendant the authority to prescribe rules and regulations, does not permit this waiver authority to be sub-delegated. Executive Order No. 11623, § 3, 36 F.R. 19963 (Oct. 14, 1971).

Executive Order 11623 delegates to the Director of the Selective Service System the power to prescribe "Rules" and "Regulations" in accordance with the Act. By its terms, these Rules and Regulations in proposed form must be published [6] in the Federal Register, Executive Order 11623, Section 1, and *republished* when issued in order to be considered effective. *Id.*, section 2(c).

While the pre-publication and publication sections of the Act and the implementing Executive Order do not further define what are considered to be "Rules" and "Regulations", it is inconceivable

that policies intended to have the force and effect of the policies purporting to effect the Plaintiffs in this proceeding, may be considered anything other than "Rules and Regulations", notwithstanding the label attached by Defendant, and may be applied to Plaintiffs or any affected registrant without having been published in a manner in accordance with the Act.[7] Whatever Defendant has entitled these unpublished but written policies, they "purport[s] to be an authoritative declaration of policy issued for the guidance of the [Selective Service] System's line officers". Nat'l Student Ass'n v. Hershey, 134 U.S.App.D.C. 56, 412 F. 2d 1103, 1115 (1969). Therefore, the letters and Temporary Instruction in question are as much "regulations" as any administrative agency's standardized, enforced, and broad policy directives. Cf., Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Bristol-Myers Co. v. FCC, 138 U.S.App.D.C. 22, 424 F.2d 935 (1970).

Additional support for Plaintiffs' position that LASD 00–51 and Temporary Instruction 660 should be treated as "rules" under the Administrative Procedure Act and "rules and regulations" covered by § 13(b) of the statute and E.O. 11623 is the administrative construction given such documents by the Selective Service System itself. The System apparently treats an LBM and an LASD as the equivalent of a "regulation", using them to amend, modify or rescind each other. *E. g.*, LBM 87 significantly amended 32 C.F.R. 1622.15(b) (2); LBM 122 purports to supersede or

---

6. Before publication of any proposed Rules or Regulations, the views of the "Secretary of Defense, the Attorney General, the Secretary of Labor, the Secretary of Health, Education and Welfare, the Secretary of Transportation, the Director of the Office of Emergency Preparedness, and the Chairman of the National Selective Service Appeal Board must be solicited at least ten days beforehand." Executive Order 11623, § 2(a).

7. Indeed, this is recognized in the Defendant's own pleadings to this Court: "Obviously, Congress should not be deemed to have contemplated . . . that material . . . could henceforth be issued without pre-publication by the simple device of labelling it something other than a regulation." Opinion Letter from Office of Legal Counsel, Department of Justice dated February 23, 1971, appended to Defendant's Motion for Summary Judgment and Statement of Reasons.

nullify 32 C.F.R. § 1622.25(a); certain amendments to LBM 99 amend the 1972 version of 32 C.F.R. § 1631.6 by, among other things, dividing the EPSG into parts, and by creating an EPSG "RSN" cutoff;" and LASD 00–23 revives the II–A deferment for doctors, thus amending at least in substance 32 C.F.R. § 1622.22(a). Defendant himself provides an example of this amending process of direct relevance here by admitting that the unpublished LASD 00–51 and Temporary Instruction 660–1 purports to alter the relevant provisions of the published LBM 99.

Defendant relies in part on a three-point test suggested by the Department of Justice to determine whether a Selective Service policy directive is a regulation.

(1) What is the System's "expert characterization of the document."

(2) What is the "function" of the document; and

(3) What has been the "past treatment" of the subject matter. Letter to General Counsel, Feb. 23, 1972, p. 10.

The Justice Department's opinion is consistent with and supports the conclusion reached by this Court.[8] The LASD and Temporary Instruction which are the subject of this suit purport to significantly amend the order of call procedures and criteria for conscientious objectors, altering the System's former practice, a practice codified in its own previously-existing and valid *regulations*, including 32 C.F.R. § 1660.20.[9] Since the "order of call" inevitably determines who shall not serve, policies governing it go to the very core of the Defendant's functions. Moreover, the past treatment of this subject certainly has not been in the form of unpublished and intentionally secretive memoranda, and, in fact, as the Defendant has admitted, the LASDs and the Temporary Instruction is in conflict with an earlier *published* Local Board Memorandum.

The Court is not unmindful of the administrative problems that would result if all internal directives of importance were required to be published. However, this is not what the Court intends. Instead, the Court is stating only that Defendant must publish that which the clear language of the APA and the 1971 Act require, i. e., those policies, rules, directives, or amendments, interpretations, implementations, or repeals thereof that come within the APA definition of a rule and the Military Selective Service Act requirement that rules and regulations of the System be published. True "housekeeping matters" may be dealt with in a more informal manner. In sum, the Court finds that the failure to publish LASD 00–51 and Temporary Instruction 660–1 renders these documents as having no force and effect. Therefore, the receipt of SSS Form 152s by Plaintiffs did not result in their being locked or "inducted" into alternative civilian service, and in view of the Defendant's treatment of similarly-situated I–As, Plaintiffs may not now be ordered to civilian work.

## C

Assuming, *arguendo*, that the Defendant's unpublished directives had, in fact, changed the force and effect of the SSS Form 152 so as to effectively "lock" these Plaintiffs into the System, Section 6(j) of the 1967 Act, as amended, still precludes the Defendant from ordering these Plaintiffs into alternative civilian work at this time.

Disparate treatment of similarly-situated members of the 1972 Extended Priority Selection Group is unlawful. Even if the most recent pronouncements of the System were not legally required to be published in order that they take

---

8. See note 7, *supra*.

9. The continuing validity of Rules and Regulations predating the 1971 Act was assured only by section 1 of Executive Order 11623, thus reinforcing the view that this order is a vital component in Defendant's rule-making authority.

effect, and even if the Defendant can be said to have effectively locked these Plaintiffs into the System upon receipt of their SSS Form 152s, if the effect of that decision by the Defendant is to treat similarly-situated members of the 1972 EPSG in a manner that causes the I–O members of the 1972 EPSG to be called for service when their I–A brethren in the 1972 EPSG are not being inducted, such action violates the Act.

The Selective Service Act of 1967, section 6(j), 50 U.S.C. App. § 456(j), provides that alternative civilian service is only to be in "lieu of induction". Regulation 32 C.F.R. 1660.4(a) implements this provision by prescribing that "a non-volunteer will not be ordered to perform alternate service in lieu of induction before registrants with his RSN (Random Selection Number) who are classified in Class I–A or I–A–O are ordered for induction." It is these provisions that are being violated.

In summary, assuming that Plaintiffs and their I–A counterparts were "locked-in" at an earlier point in time, if the back door is now unlocked for the I–As, and they have been released from serving their country, it must also be unlocked for the I–Os who must be treated in similar fashion.

## CONCLUSION

Therefore, this Court concludes that Plaintiffs' Motion for Summary Judgment be granted and that pursuant to the Order of this Court attached hereto and made a part hereof:

1. Defendant, as Director of the Selective Service System, shall cancel any work orders which may have been issued to Plaintiffs through SSS Form 153 or its equivalent;

2. Defendant, Director of the Selective Service System, shall place Plaintiffs into the 1972 Second Priority Selection Group;

3. Defendant, as Director of Selective Service, shall be permanently enjoined from issuing to the Plaintiffs SSS Form 153 (Order to Report for Civilian Work)

or its equivalent unless those I–A and I–A–O registrants who are members of the 1972 Extended Priority Group Subgroups A and B who have been placed in the 1972 Second Priority Selection Group as a result of Selective Service System directives have been lawfully issued SSS Form 252s after April 1, 1972.

It is so ordered.